IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2013

**STATE OF TENNESSEE v. GREGORY D. VALENTINE**

**Appeal from the Criminal Court for Sumner County**
**No. 1212-2009     Dee David Gay, Judge**

_____

**No. M2012-02487-CCA-R3-CD - Filed August 13, 2013**

_____

Pursuant to a plea agreement, the Defendant-Appellant, Gregory D. Valentine, entered best interest pleas to twenty counts of identity theft, six counts of criminal simulation, one count of forgery, one count of theft of property valued at $10,000 or more but less than $60,000, one count of money laundering, and one count of filing a false police report in exchange for an effective sentence of twelve years and eight months, with service of thirty-two months at seventy-five percent in confinement at the county jail followed by service of ten years at thirty percent on state probation. Shortly after entry of these judgments, Valentine filed three pro se motions to set aside his pleas, which the trial court denied without a hearing. Valentine appealed, and this court reversed the trial court and remanded the case for an evidentiary hearing. See State v. Gregory Darnell Valentine, No. M2010-02356-CCA-R3-CD, 2012 WL 3263117 (Tenn. Crim. App. Aug. 10, 2012). On remand, the trial court conducted an evidentiary hearing and again denied the motions. On appeal, Valentine argues that the trial court erred in denying his motions to set aside his best interest pleas. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Lawren B. Lassiter, Gallatin, Tennessee, for the Defendant-Appellant, Gregory D. Valentine.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lawrence R. Whitley, District Attorney General; and Thomas B. Dean, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

On December 10, 2009, a Sumner County Grand Jury indicted Valentine and five co-defendants for twenty counts of identity theft, six counts of criminal simulation, one count of forgery, one count of theft of property valued at $10,000 or more but less than $60,000, and one count of money laundering. In addition, Valentine was individually indicted for one count of filing a false police report.

**Plea Submission Hearing.** At the October 14, 2010 plea submission hearing, Valentine waived his trial by jury and requested the court's acceptance of his best interest pleas to the charged offenses in exchange for an effective sentence of twelve years and eight months, with service of thirty-two months at seventy-five percent in the county jail followed by service of ten years at thirty percent on state probation. The State summarized the facts supporting Valentine's best interest pleas:

> The facts stem from events on the 30th of September, 2009[,] in Hendersonville, Tennessee. At that time, one of the Bank of America branches called Hendersonville Police Department, said they had in the bank at that moment a member of a fraud ring who had perpetrated identity theft. She was in the bank at that time. Ultimately, they reported that she was leaving the bank and fleeing the premises.
>
> Hendersonville Police Department Officers were actually driving by the bank at that time; they saw the woman fleeing the bank. Then they heard the call almost immediately. They turned around; they saw the woman get into a van containing, counting her, six individuals. It was a rental van out of California.
>
> The police began an investigation at that time to determine who she was. She said she was Gail Shapiro, which is the name on the identification that she had presented to the Bank of America. The other defendants, all the others in the van, supported that story that they had just picked her up. They didn't know her.
>
> As the investigation continued, it was shown that these defendants had been together for days and had been traveling across the country. There are images in the Illinois, Chicagoland [sic] area, in Northern Indiana, of members of this group, specifically, Maurice Reed and Yolanda Carter, the two individuals who were taken for Federal prosecution going in multiple banks, perpetrating fraud, typically, in the form of account hijacking. Most of these

actions occurred outside of [the] State of Tennessee and outside Sumner County.

What we have is on the 30th, Maurice Reed went into a bank in Hendersonville at about 9:30 in the morning, started an account under the name of Greg Shapiro. He then went to the Madison branch at about 10:30, 10:15 I think it was; Bank of America made a transfer from the real Greg Shapiro's account to the bogus Greg Shapiro account he had just created, transferred $16,000, withdrew $7,500. Then [he returned to] the van, and he went back to Hendersonville later that day. They withdrew another $7,500 from a different branch of Bank of America.

And then around 2:00 in the afternoon, with all six individuals in the van, Yolanda Carter went into the Bank of America, attempted to start an account under the name of Gail Shapiro. The bank got wise, called Hendersonville. I've already explained that part of the story.

Based on that information and the numerous false identifications that were found in the van, were later found in the van, and the many scraps of paper in the van with bank account holder's names, social security numbers, account number[s], date of birth, sometimes mother's maiden name that sort of information that led to the charges before the Court.

Criminal Simulation for the fake [identifications]. Identity Theft for the information on the many pieces of paper regarding the individual account holders. False Report for saying that the defendant who was later determined to be Yolanda Carter was Gail Shapiro. Theft over $10,000 relating to the $15,000 that was removed from Greg Shapiro's bank account. Forgery for Maurice Reed signing the name of Gregory Shapiro on the bank documentation to open the false bank account that morning in Hendersonville, and identity theft for his use of Greg Shapiro's name at that time, and one Identity Theft count for Yolanda Carter using Gail Shapiro's name, that I've already discussed.

That's the facts related to this charge. There is a money laundering charge that is Money Laundering by Promotion of a Criminal Enterprise by Reinvesting Criminal Proceeds. So it's under [Code section 39-14-]903(b) of the money laundering [statute]. That is for the deposit of $100 that went in to start the bogus account on that morning in the name of Greg Shapiro. I think that covers all the facts.

-3-

Mr. Valentine according to the State's information is the leader of this enterprise, at least the highest ranking person of the enterprise that was in the van; therefore, we have made a different offer to him than to the others.

Following the State's recitation of the facts supporting Valentine's pleas, the trial court informed Valentine that his best interest pleas had the same effect as guilty pleas or guilty verdicts by a jury. During the plea colloquy, Valentine told the court that he had graduated high school. He also stated that he had reviewed the plea agreement and the petition for waiver of a trial by jury with his attorney and that he understood the terms of both of these documents. He said he was entering his best interest pleas voluntarily and that his attorney had explained the elements of the charged offenses, the punishments for these offenses, and the evidence against him. Valentine stated that he was satisfied with trial counsel's representation and that there was nothing more that he wanted trial counsel to do as his attorney. The trial court detailed the rights Valentine was waiving by entering his pleas, and Valentine replied that he understood he was waiving each of these rights. Valentine accepted the State's recitation of the facts regarding the relevant offenses as stated by the prosecutor, and the trial court accepted Valentine's best interest pleas and imposed the sentences specified in the plea agreement. When the trial court asked him if he had any questions, Valentine responded that he did not. The judgments for Valentine's convictions were entered on October 14, 2010.

Valentine filed three pro se motions to set aside his pleas on October 19, 2010, October 20, 2010, and October 21, 2010. On October 26, 2010, the trial court denied these three motions without a hearing, and Valentine filed a document entitled "'Pro Se Motion to Appeal' Denied [M]otion to Set Aside Plea." He was subsequently appointed appellate counsel. On August 10, 2012, this court reversed the trial court and remanded the case for an evidentiary hearing. See Gregory Darnell Valentine, 2012 WL 3263117, at *1-2. Specifically, this court held:

Defendant actually filed three pro se handwritten pleadings, and each one was captioned as "motion to set aside plea." These are marked filed by the trial court clerk on October 19, 2010, October 20, 2010, and October 21, 2010. The basic allegations in all three motions are the same, with some additional facts alleged or notarizations indicated in each of two of the motions, which were not alleged in the other two respective motions. We will treat these as timely filed motions to withdraw guilty pleas, as amended. Considering all three pleadings together and in proper context, Defendant alleged that he is entitled to withdraw his guilty pleas (1) because he was coerced to enter the guilty pleas by his attorney using "my baby['s] mother as a bargaining tool"; (2) because other persons identified only as "Johnson," "Ross," and "Young"

-4-

were supposed to be released upon his guilty pleas, and they were not; and (3) because of somewhat vague allegations of a misunderstanding between Defendant and the State concerning the negotiated plea agreement.

On October 26, 2010, the trial court entered an order that was a pre-printed one-page form which also contained a summary of Defendant's motion. It is clear that the pre-printed order is designated for use only in the cases of pro se motions. The trial court checked the line which provides that the pro se motion is "Denied without a hearing" and beside this printed line, hand wrote "'manifest injustice' has not been shown by this defendant."

. . . .

Defendant's allegations are sufficient to warrant an evidentiary hearing on his motion to withdraw the guilty pleas. The trial court erred by summarily dismissing the motion, as amended, without an evidentiary hearing. State v. Jerry Louis Fitzgerald, Jr., No. W2009-02520-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 703 (Tenn. Crim. App.[] Aug. 20, 2010).

Id. at *1-2.

**Evidentiary Hearing.** Following this court's remand, the trial court conducted an evidentiary hearing on September 28, 2012, to consider Valentine's motions to set aside his best interest pleas. At the hearing, Valentine's attorney conceded that there was "really nothing in the transcript copy [of Valentine's plea submission hearing] that would indicate anything before Your Honor in your dialogue with him that would suggest anything other than a proper plea." The trial court responded, "[L]et the record reflect, according to the transcript, [Valentine] made no complaints about his plea." The court added, "In the transcript, [Valentine's] plea was voluntary and knowing, and in his transcript he had no complaints against the attorney."

Valentine, the Defendant-Appellant, testified that because he had filed his pro se motions to set aside his plea, he had remained in jail until the date of the evidentiary hearing, September 28, 2012, even though he would have been released in September 2011 pursuant to his judgments of conviction. He acknowledged that because of his motions to set aside his pleas, he had remained in jail for nearly three years. He also acknowledged that if the court granted his motions, he would start his cases anew. Moreover, Valentine acknowledged that if his motions were granted, then he would remain in confinement until trial unless he was able to post bond.

-5-

Valentine said he made the decision to file his first motion to set aside his pleas the same day he entered his best interest pleas: "After court, I went back and . . . wrote [the motion] and went and got it notarized the next day and sent it out."  He alleged in his first motion that his attorney had coerced him into entering his pleas by telling him that "it was going to be an all white jury, [the trial judge] was mean, [and the judge] was going to give me 50 years."  He said that at the time he entered his pleas, he had been in jail for approximately thirteen months and had never told his attorney he wanted to plead guilty.  He stated, "From the time I got locked up from September 30th, 2009, my offer was always 30 years" but on"October 14th, [the offer] miraculously [was reduced] to two years or three years or something[.]"  He asserted that trial counsel made the following statements to him about the new offer:

> This is a good offer that they are offering you, if you don't take this right here–and I'm writing this letter to the Board of Professional Responsibility stating that I represented you to the best of my ability, so that if you go ahead and pursue this, we try it–and [the trial judge] is a mean judge and [you will have] an all white jury, you're going to get the maximum and all that if you don't take this [offer].

Valentine continued, "[A]ll of a sudden . . . [trial counsel] became belligerent because I refused that [offer].  He stated that trial counsel then used Takisha Johnson to coerce him into accepting the offer:

> [Trial counsel] came back with Takisha Johnson and I was able to get a kiss from Takisha Johnson back in behind the sergeant's desk, which was recorded on the institution facility camera, which is not supposed to be allowed.  [I told trial counsel that] I'm still not taking the deal.  I was brought to the booking front, to the booking area again.  You know what I'm saying? [Trial counsel] came with Takisha Johnson and again [I] was able to get a kiss, and to go ahead and coerce me.  And then after the court proceedings were over, we came up out of court and [he] again allowed me to get a kiss from her right out here, which was again recorded on the camera.

Valentine stated that the purpose of trial counsel's allowing him to kiss Johnson was to "butter him on up" so he would accept the State's offer.  He said trial counsel promised him that he would represent him for free if there was a federal prosecution.  Valentine said he knew his co-defendants, Kevin Ross, Howard Young, and Takisha Johnson, were going "to go home" if he accepted the State's offer.

Valentine recounted his conversation with Johnson before he entered his pleas:

> I mean, [Johnson] was trying to tell me, go ahead and take this plea so I can go home. I want to go home and see my kids. And my attorney–you know what I'm saying? Sergeant tried to–like he knew that wasn't protocol, so he tried to intervene. But my attorney was, like, no, go ahead and let him–you know.

He stated that trial counsel told him not to ask any questions during the plea submission hearing and to say "yes and no and get this over with and get out of here as fast as possible." Valentine stated that he did not alert the trial court of his attorney's coercion because he thought he did not have a choice:

> Because my attorney is telling me back there I'm going to get an all white jury, I'm not going to get a fair trial, and he's a mean judge[,] and it's the best sentence that I'm going to receive. I'm already screaming from the very beginning I wouldn't . . . accept no pleas, and then when my attorney is telling me this, I'm thinking that it's over. You know, I don't know what to do.

Valentine also claimed he was too scared to inform the trial court of trial counsel's coercion:

> I mean, but if somebody put the fear of God into you before you even came up into–if you do this, this is going to happen to you, then, of course, I'm terrified to say something. I was too scared to say anything else besides go along with what [trial counsel] told me.

When Valentine was asked if he realized he could be released the day of the evidentiary hearing if he withdrew his motions, he responded, "I can't withdraw this, sir. I'm not guilty of none of these charges."

On cross-examination, Valentine admitted that even though he was a multiple convicted felon, he received a probationary sentence of ten years at thirty percent, which is the release eligibility percentage that someone with no prior felonies receives. He also admitted that if convicted at trial on his charges, he would receive a substantial amount of time. Valentine reiterated that he did not inform the trial court that his attorney had coerced him into entering his pleas because he was terrified:

> What is it called, sir, when you, like, may be petrified? You've got a woman who's being abused by her husband and you've got the police right there and

the police said, are you being abused by your husband and she said no, but her husband is almost beating the life out of her, but right in front of help she's too terrified to say anything. That right there is my scenario. That's what you can relate my feelings to, my emotions to. All the psychological emotion I was going through being in here, the length of time that I had been able to proceed and go to trial, and I've been very vocal about writing the Judge a letter saying I didn't want no deal under no circumstances. And I was put back in August and I was supposed to be going to trial October 5th.

October 1st there's no trial. There's no trial for some reason. I don't know what is going on. My attorney didn't confer with me and [did not] let me know what was going on. And October 14th , all of a sudden–for 13 months my offer has been 30 years, 30 years, 30 years, but now all of a sudden, come October, I'm fixing to get a beautiful deal. I mean, all–me and all my co-defendants was facing 30 years. They had career, 65 percent [release eligibility]. I would get mine at 30 percent [release eligibility]. And all of a sudden they get to go home. If anybody was supposed to have went home, it should have been me, but all of a sudden they go home and I get to stick around. I get to stay up in good old Sumner County.

Valentine admitted that in addition to his complaint about trial counsel, he had also written letters complaining about the Sumner County justice system. The court took judicial notice of the fact that Valentine had filed a complaint with the Court of the Judiciary against the trial court. Valentine also admitted that he had five to seven prior felony convictions.

In response to questioning from the trial court, Valentine stated that it was not in his best interest to accept the State's final offer of thirty-two months at seventy-five percent in confinement with ten years at thirty percent on probation even though he had initially been offered thirty years in confinement because he was innocent of the charges. He stated that he entered his best interest pleas because he "was psychologically abused, coerced[.]" Then the court and Valentine had the following exchange:

The Court:  Now, you're telling this Court that because you were told I was a mean judge, that you were going to get a maximum sentence, that you were going to be convicted by an all white jury, and that you got three kisses from your girlfriend, you changed from 30 years to being coerced into something that was substantially less. Is that your testimony?

-8-

[Valentine]:  My testimony is that that's what led to me accepting the [offer of] 32 months [in confinement].

Valentine stated that he was able to file his first motion to set aside his pleas the same day he entered them "because [he] was no longer in the presence of [his] abusers." He said that by "abusers" he meant trial counsel.

In response to questioning by the State based on his National Crime Information Center report, Valentine admitted that he had prior convictions for receiving stolen property in 1997, vehicle theft in 1998, carrying a firearm in 1999, and false check or false record or false certificate in 2001.  Although he had previously testified that he had five to seven prior felony convictions, on cross-examination he denied that he had been convicted of more than one felony.  He later admitted that he had been convicted as a juvenile of one count of murder in the first degree, three counts of attempted murder, and one count of accessory in California in 1986.

Takisha Johnson testified that she and Valentine had a child together and that she had been charged with Valentine as a co-defendant.  She described the events leading up to Valentine's plea:

We had got a plea.  We were supposed to go to trial, but we ended up getting a plea, and he didn't want to take it.  I was allowed to go to the sergeant's station first to try to talk to him.  I wanted to go home, so I begged him to please, can you sign the paper.  You know, I don't want to fight this.  He said no, so, once again, they moved him to the back part of the jail where they book you in and change your clothes out.  That's where I was allowed to come face-to-face with him again.

Johnson detailed her second conversation with Valentine:

[Valentine] was in a cell, and we were in front of each other, and I asked him to let me go, I wanted to go home.  I told him I didn't want to fight it.  I didn't want to fight 30 years.  I didn't want to fight Sumner County.  I was tired.  I was ready to go home.  I wanted to go home to my kids.  I don't want to gamble with 30 years.  He said he didn't want to sign it, and I told him please, please, I want to go home.  I don't want a battle.  I don't want to sit in Tennessee prison for 30 years.  I'm from California.  I had no family here, no nobody.  He said, no, no, we're going to fight.  I just told him, no, please.  For my best interest, as far as I'm concerned, I want to go home.  Because from how we were told, if he didn't sign, then the [other co-defendants] couldn't go.

On cross-examination, Johnson asserted that at the time of her arrest on September 30, 2009, she was unemployed and was vacationing with Valentine and traveling with the other individuals in the rented van. She admitted that she had $7,800 in her possession at the time of her arrest but claimed, by way of explanation, that her parents did "very well" and had annual salaries totaling over two hundred thousand dollars. She also admitted that the other individuals in the van also had large rolls of money but claimed that these individuals were "professional gamblers, poker players."

Johnson said the day of her arrest, she went into the post-office to mail something. She said she was unaware that Yolanda Carter, a co-defendant, had gone into the Bank of America in Hendersonville and was unaware that Carter, claiming to be a woman named Gail Shapiro, had withdrawn $7500. Johnson said she had just gotten back into the van after leaving the post office when she saw Carter run from the bank and jump into the van. Shortly thereafter, they were stopped by the police and arrested. Johnson denied stopping at other banks across the country, denied seeing any fake identifications or documents listing people's names, addresses, mother's maiden names, and social security numbers, and denied seeing any money passed around the van. Johnson said she never heard Carter mention the name "Gail Shapiro" when she got back inside the van. She admitted that she was released for time served on her plea date. She also admitted that she was on parole in California for fraud at the time of her arrest and that she had five prior felony convictions. Johnson denied committing crimes in Sumner County with the other individuals in the van.

Trial counsel testified that he had been practicing law since 1997. He stated that he spent his first three years working as a prosecutor before going into private practice as a criminal defense attorney. He said that he had represented thousands of defendants. Trial counsel said he represented Valentine in the instant case, and he summarized the events surrounding Valentine's acceptance of the State's offer of thirty-two months in confinement followed by ten years on probation:

> I met with [the prosecutor] numerous times on this case, and Mr. Valentine. My recollection was that I met with [the prosecutor,] and he had conveyed that [new] offer to me prior to that court date. My recollection was that I had met with Mr. Valentine in jail prior to the plea date to convey the offer to him. That is my recollection. My recollection was not that the offer was given that day.

He stated that "there had been some issues and difficulties that the state was going to have in getting their witnesses together," which had precipitated the offer of thirty-two months in confinement followed by ten years on probation. He reiterated that he conveyed the new offer to Valentine prior to his plea date.

Trial counsel recalled meeting with Valentine in the general population holding tank without Johnson. Trial counsel was unsure whose idea it was to have Johnson talk to Valentine:

> And I'm not sure–if it was her idea, if Mr. Valentine wanted to speak to her, if it was my idea. Honestly, sir, I'm not sure whose idea it was to bring Ms. Johnson and Mr. Valentine together. It may have been her idea. It may have been her attorney's idea. I don't recall specifically.

Regarding the timing of Valentine's acceptance of the plea, trial counsel stated, "Mr. Valentine gave me the impression . . . prior to his plea date that he would accept that offer [of thirty two months at seventy-five percent in confinement followed by ten years on probation]. The date of the plea, Mr. Valentine changed his mind. He did not want to accept that offer." Trial counsel stated that the issue regarding the release of the co-defendants for time served was a part of the plea agreement and had been resolved prior to Valentine's plea date.

Trial counsel stated that when Valentine changed his mind and rejected the offer, Johnson was brought out to meet with him, and trial counsel observed this meeting. He stated, "I didn't want to hover. We were there for the purpose of–they wanted to discuss the plea, because we thought it was a done deal, and Ms. Johnson did beg him to take it. She said, please, please take it. Her recollection of that is correct." However, trial counsel stated that he did not remember "any of the kisses" between Valentine and Johnson. He stated that Valentine, after talking with Johnson, decided to accept the State's offer.

Trial counsel said that Valentine was extremely worried about a federal prosecution at the time. He told Valentine that the prosecutor did not believe "that the federal government was going to pick up these charges" and that the prosecutor "was not going to make a referral to the federal government." Trial counsel said he was so certain that Valentine would not be federally prosecuted that he signed a document promising to represent Valentine free of charge if any federal charges arose.

Trial counsel denied making statements to Valentine about the trial judge and about having an all white jury:

> Those [allegations] are false. I informed [Valentine] that [the trial judge], in my experience, having traveled across the state and handled cases all over this state, [the trial judge] is, in my opinion, a tough sentencing judge. And I certainly let him know that, and that if he was convicted, he would get, in my opinion, a lot more [time] than what the current offer was.

-11-

On cross-examination, trial counsel stated that the plea offer was the result of a compromise between Valentine and the State:

> Mr. Valentine said he had not talked about pleading, and that was not true. Mr. Valentine was willing to take a probation offer, but he was looking for probation and [the State was] talking about 30 years. What I kept trying to do is come up with a compromise that would–I could bring to [the State] and bring to Mr. Valentine, and that's how that deal was formulated, taking into consideration what Mr. Valentine wanted with the reality that, you know, the [S]tate wasn't just going to roll over on this case, given his history and the facts.

Trial counsel stated that Valentine insisted that a specific release date be included in the plea agreement.

At the conclusion of the evidentiary hearing, the court summarized the case's procedural history and noted that this case had been remanded for an evidentiary hearing. The court stated that the transcript from the plea submission hearing indicated that Valentine's plea was knowing and voluntary:

> The Court went through [the] guilty plea proceedings with the defendant, and at the time I was very comfortable and I'm still very comfortable that at the time the defendant entered his plea on October 14, 2010, that it was knowing, that it was voluntary, and there was no force, there was no coercion whatsoever.

The court also evaluated the credibility of the witnesses in its oral findings of fact:

> In referring to the testimony that I heard today, Mr. Valentine's case was set for trial on November 1st. Mr. Valentine testified. He and Ms. Johnson are convicted felons. They both have numerous felony convictions on their record. I do not find the testimony of Mr. Valentine believable, credible or truthful. The testimony about an all white jury, [that I am] a mean judge, [that I] will give you 50 years was discredited by [trial counsel,] and I find that to be unbelievable.
>
> Kisses in the jail, I find that to be incredible and unbelievable. Many things the defendant states do not make any sense. He stated that . . . after he [submitted] his guilty plea, he went back there and did this petition because he

was no longer in the presence of his abusers. That's not like the character of this defendant. He's one that stands up and he'll continue to stand up and he's not intimidated by anything or anybody. That's simply not true.

The testimony of Takisha Johnson is not credible. She was on parole in California when she came here. She was not on vacation when she came through this jurisdiction. And she came here today all the way from California at her own expense, own time, own money. I find her testimony not believable.

To the contrary, I [ac]credit the testimony of [trial counsel, who is] experienced as a prosecutor, defense attorney, [who has represented] thousands of defendants. He represented [Valentine] in this case. He met with [the prosecutor,] and he met with [Valentine] many times, and I found that to be true in dealing with the numerous attorneys[,] and the problems that accompanied this case through Criminal Court.

The testimony is clear that [Valentine] gave an initial impression that he would take the offer after it was made. And it's worth mentioning here a 30-year offer coming down to 32 months, [effectively] two years [in confinement], and ten years['] probation is significant, absolutely significant, along with the fact that there is a guarantee of no federal prosecution.

Now, it's not manifest injustice for [Valentine] to take this incredible offer. It is a bit of reality, with the prosecutor, hard work of the defense attorney to get to this point in a very difficult case. Although the defendant later changed his mind about the plea and although he had an opportunity to talk to his girlfriend, he agreed to take it.

Now, Mr. Valentine is a grown man. He's very assertive. He knows what he wants, and he wanted a guarantee that this plea would not be used against him if I did not accept the plea. He wanted a guarantee that there would be no federal prosecution, and he got two years in jail with a certain date to be released, and that's what he wanted.

The court recounted that Valentine signed the plea agreement, which stated that he was freely and voluntarily entering his plea with no threats or pressure of any kind and without promises or gain from any source. The court also read portions of the plea submission hearing, which indicated that Valentine he understood the consequences of his pleas and was entering his plea knowingly and voluntarily and without coercion.

-13-

The court then stated its legal conclusions:

In looking at Rule 32 and determining manifest injustice, what I see here is a complete absence of manifest injustice. What I see here is the criminal justice system at work, at its best, preserving the constitutional rights of Mr. Valentine, giving him the best the Sixth Amendment has to offer, and [trial counsel] giving him opportunities to come into court, do motions and so forth.

There is a desperate need in our criminal justice system for finality. How bad does it reflect on the system when somebody comes in immediately after they are under oath[,] and they say one thing, and then they go out of court and say, huh-uh, didn't mean it, I want a do-over? We would be completely tied up for years.

To the contrary, as I stated, this Court has bent over backwards to protect the constitutional rights of this defendant, and they have been protected. There has been justice in this case to the advantage of the defendant, great advantage to the defendant. I think it is absolutely absurd in referring to the nature and context of these allegations–it is, as [the prosecutor] stated, manipulation at its finest.

That, Mr. Valentine, this Court will not accept and neither will the criminal justice system of Tennessee. This is respectfully denied.

On October 19, 2012, the trial court entered an order denying Valentine's motions to set aside his pleas "for the reasons stated in open court and on the record." On October 24, 2012, the trial court released Valentine from the county jail so that he could begin serving the probationary portion of his sentence. On October, 26, 2012, the court entered an order requiring Valentine to report to the probation office for the purpose of providing a DNA sample because he was a convicted felon. On November 14, 2012, Valentine filed a notice of appeal.

## ANALYSIS

On appeal, Valentine argues that the trial court erred in denying his motion to set aside his best interest pleas. Specifically, he claims that his "plea was not entered into knowingly, voluntarily nor understandingly" as required by "Rule 11([b]) of the Tennessee Rules of Criminal Procedure" because trial counsel coerced him into entering the plea. The State responds that the trial court properly found that no manifest injustice existed warranting the

-14-

withdrawal of Valentine's best interest pleas. We agree with the State and conclude that the trial court did not abuse its discretion in denying Valentine's motions to set aside his pleas.

This court reviews a trial court's decision regarding a motion to withdraw a guilty plea for an abuse of discretion. State v. Crowe, 168 S.W.3d 731, 740 (Tenn. 2005); State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). "An abuse of discretion exists if the record lacks substantial evidence to support the trial court's conclusion." Crowe, 168 S.W.3d at 740 (citing Goosby v. State, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)).

Tennessee Rule of Criminal Procedure 32(f) provides:

Withdrawal of Guilty Plea.

(1) Before Sentence Imposed.–Before sentence is imposed, the court may grant a motion to withdraw a guilty plea for any fair and just reason.

(2) After Sentence But Before Judgment Final. –After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice.

Tenn. R. Crim. P. 32(f) (emphases added).

Here, Valentine 's judgments were entered on October 14, 2010, and he filed the first of his motions to set aside his pleas on October 19, 2010. "As a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) (citing Tenn. R. App. P. 4(a) and (c); State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991)). Because Valentine filed his motion to set aside his pleas after his sentence was imposed but before the judgments became final, the more demanding standard, "to correct manifest injustice," applies to our review of the trial court's denial of the motion. See Tenn. R. Crim. P. 32(f); Crowe, 168 S.W.3d at 741. "This standard is based 'upon practical considerations important to the proper administration of justice.'" Crowe, 168 S.W.3d at 741 (quoting Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)). This court has outlined certain circumstances that warrant the withdrawal of a guilty plea under the manifest injustice standard:

Although Rule 32(f) does not define "manifest injustice," courts have identified on a case-by-case basis circumstances that meet the manifest injustice standard necessary for withdrawal of a plea. See Turner, 919 S.W.2d

-15-

at 355; [State v.] Evans, 454 S.E.2d [468,] 473 [(Ga. 1995)]. Withdrawal to correct manifest injustice is warranted where: (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

Crowe, 168 S.W.3d at 741-42 (internal footnotes omitted); accord State v. Virgil, 256 S.W.3d 235, 240 (Tenn. Crim. App. 2008). The defendant bears the burden of establishing that his or her plea should be withdrawn to correct manifest injustice. Turner, 919 S.W.2d at 355 (citation omitted).

We note that "[a] defendant does not have a unilateral right to withdraw a plea." Crowe, 168 S.W.3d at 740 (citing State v. Mellon, 118 S.W.3d 340, 345 (Tenn. 2003); Turner, 919 S.W.2d at 355; State v. Anderson, 645 S.W.2d 251, 253-54 (Tenn. Crim. App. 1982)). Moreover, "a defendant's change of heart about pleading guilty or a defendant's dissatisfaction with the punishment ultimately imposed does not constitute manifest injustice warranting withdrawal." Id. at 743 (citing Turner, 919 S.W.2d at 355).

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before

determining whether a guilty plea is voluntary and intelligently made. Id. These factors include the following:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

Valentine's plea colloquy shows that he entered his best interest pleas voluntarily, that he was pleased with trial counsel's representation, and that he understood the terms of the plea agreement and the rights he was waiving by entering his pleas. We conclude the transcript of the plea submission hearing is devoid of evidence that trial counsel coerced Valentine was coerced into entering his best interest pleas. We also conclude that Valentine failed show at the evidentiary hearing that his plea should be withdrawn to correct manifest injustice. In applying the aforementioned Blankenship factors, we note that by all accounts Valentine was a very intelligent individual. The State concluded that Valentine was the leader of an elaborate identity theft ring that had traveled across the country stealing money from individuals' bank accounts. Trial counsel stated that Valentine was meticulous about the details of his plea agreement, even to the point of requiring that a specific date for his release from jail be included in his plea agreement and judgments of conviction. Moreover, the trial court observed that Valentine was "very assertive" regarding the terms of his plea agreement and knew what he wanted when it came to his case. Regarding Valentine's familiarity with criminal proceedings, the record shows that Valentine had an extensive criminal history, which included convictions as a juvenile for one count of murder in the first degree, three counts of attempted murder, and one count of accessory for murder, at least one felony conviction as a adult, and many misdemeanor convictions. Valentine's extensive criminal history as well as his assertiveness regarding the terms of his plea agreement in the instant case indicates that he was extremely familiar with criminal proceedings at the time he entered his pleas. Regarding whether Valentine was represented by competent trial counsel and had the opportunity to confer with counsel regarding his options, the record shows that trial counsel properly advised him of his options at all stages of the proceedings and was able to procure an extremely favorable plea agreement for Valentine. Although Valentine previously had been offered thirty years in confinement, trial counsel was able to convince the State to agree to thirty-two months at seventy-five percent in the county jail followed by ten years on state probation. The proof at the evidentiary hearing shows that trial counsel met with Valentine several times, provided him with the relevant offer prior to the

date of the plea submission hearing, and thoroughly discussed the offer with him. Regarding the extent of advice from counsel and the court regarding his charges, the record shows that both trial counsel and the court reviewed Valentine's charges with him extensively and informed him of the sentences he would face if he proceeded to trial. Finally, regarding the reasons for Valentine's decision to enter his pleas, the record indicates that Valentine entered his pleas to avoid a greater penalty than what he might have received at trial and to have his co-defendants, including Johnson, the mother of his child, released for time served.

We conclude that the trial court did not abuse its discretion in denying Valentine's motions to set aside his pleas and that the record fully supports the denial. Valentine failed to establish that manifest injustice warrants the setting aside of his pleas. Upon review, we affirm the trial court's judgment.

## CONCLUSION

The trial court did not abuse its discretion in denying Valentine's motions to set aside his pleas. Accordingly, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE